**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| Comfort Systems USA (Ohio), Inc., | ) |
| | ) |
| Plaintiff, | ) Case No.: 1:22-cv-00298 |
| | ) |
| vs. | ) Judge Michael R. Barrett |
| | ) |
| Jeffrey K. Wilmink, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**<u>OPINION & ORDER</u>**

This matter is before the Court on the Motion for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction filed (on May 27, 2022) by Plaintiff Comfort Systems USA (Ohio), Inc. (Doc. 2). Defendants Jeffrey K. Wilmink and Mechanical Optimizers, LLC filed a memorandum in opposition (Doc. 6),[1] to which Plaintiff replied (Doc. 9). An evidentiary hearing on Plaintiff's Motion for Preliminary Injunction was held on July 25, 2022. (07/25/2022 Minute Entry). By agreement, the parties submitted simultaneous post-hearing briefs (on August 12, 2022) in lieu of closing argument. (*See* Docs. 24/27, 26).

---

[1] Chad L. Summe was originally named as a defendant and joined in the memorandum in opposition. The parties later stipulated to dismissal (without prejudice) of all claims asserted against him pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii). (*See* Doc. 21).

For future reference, the Court directs the parties' attention to Fed. R. Civ. P. 21, which provides that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." *See Sheet Metal Workers' Nat'l Pension Fund Bd. of Trs. v. Courtad, Inc.*, No. 5:12-cv-2738, 2013 WL 3893556, at *4 (N.D. Ohio July 26, 2013) ("A plaintiff seeking to dismiss only one defendant from an action must move the Court to do so under Rule 21.") (citing *Philip Carey Mfg. Co. v. Taylor*, 286 F.2d 782, 785 (6th Cir. 1961)).

Daniel J. Lemons (President, Comfort Systems USA (Ohio), Inc.), David J. Deidesheimer (former employee, Comfort Systems USA (Ohio), Inc.), and Defendant Jeffrey K. Wilmink testified live at the July 25 hearing, which has been transcribed. (*See* Doc. 22). The video deposition of Tyler Gastright (current employee, Comfort Systems USA (Ohio), Inc.) was submitted to the Court shortly after the July 25 hearing; a written transcript was later filed, at the Court's request, on June 20, 2023. (*See* Doc. 29-1). Jared Deich, Tom Nieman, and Greg Robinson (all current employees, Comfort Systems USA (Ohio), Inc.) did not testify. Nor did Dan Martin (former employee, Comfort Systems USA (Ohio), Inc.).

## I.      FACTS[2]

**The Parties.** Comfort Systems USA (Ohio), Inc. ("Comfort Systems") is a commercial and industrial provider of service and new construction for HVACR, building control systems and plumbing building systems, including but not limited to heating, refrigeration, ventilating, and air-conditioning systems. (Doc. 1 ¶ 1). It's part of a conglomerate of approximately 40 operating companies across the United States.

---

[2] For purposes of a motion for a preliminary injunction, "a party 'is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits.'" *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). Additionally, the labels and headings included in this Opinion & Order are not controlling. *Cf. Cordovan Assoc., Inc. v. Dayton Rubber Co.*, 290 F.2d 858, 860 (6th Cir. 1961) (citing *Bogardus v. Comm'r of Internal Revenue*, 302 U.S. 34 (1937)). To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such, and vice versa. *Meyer v. Bank of Am., N.A.*, No. 2:18-CV-218, 2021 WL 868587, at *1 n.2 (S.D. Ohio Mar. 9, 2021).

(Doc. 22 PAGEID 185–86 (8:11–9:14) (Lemons direct)).[3]  It has a "large" number of competitors.  (Id. PAGEID 189–90 (12:17–13:19) (Lemons direct)).

In April 2017, Comfort Systems acquired Century Mechanical, Inc. ("Century Mechanical") in order "to strengthen [its] Cincinnati business and [its] strategy for how [it] wanted to grow in Cincinnati."  (Doc. 1 ¶ 13; Doc. 22 PAGEID 196–97 (19:21–20:15) (Lemons direct)).  As part of the transaction, Comfort Systems acquired both tangible assets (such as Century Mechanical's equipment and inventory) and intangible assets (to include customer lists, customer goodwill, sales and marketing strategies, and technical capabilities).  (Doc. 1 ¶ 13).  Prior to the acquisition, Defendant Jeffrey K. Wilmink ("Wilmink") served as a sales and marketing consultant to Century Mechanical.  (Id. ¶ 14; Doc. 22 PAGEID 197–98 (20:16–21:5) (Lemons direct)).  After the acquisition, however, Comfort Systems hired Wilmink as its Vice President of Sales and Marketing, effective May 1, 2017.  (Doc. 1 ¶ 14; Doc. 22 PAGEID 198–201 (21:6–24:14) (Lemons direct)).  A year later, on April 30, 2018, Wilmink was promoted to Vice President and General Manager.  (Id. ¶¶ 15, 16).  Wilmink reported to Dan Lemons, Comfort Systems' President, throughout his employment, which terminated effective September 16, 2020.  (Doc. 22 PAGEID 203 (26:8–14) (Lemons direct); JX 12 (Bates COM0003)).[4]

Prior to his employment at Comfort Systems, Wilmink ran a consulting business known as "Excellence Commitment," which he started in April 1996.  Wilmink devoted

---

[3] "Comfort Systems [USA] in a publicly traded company on the New York Stock Exchange.  They have their corporate office in Houston, Texas.  It functions pretty much as a holding company, and all the business operations come through the different operating companies.  There are currently approximately 40 operating companies."  (Doc. 22 PAGEID 185 (8:17–22) (Lemons direct)).

[4] Wilmink advised Lemons of his intention to resign as Comfort Systems' Vice President and General Manager in early September 2020.  (Doc. 22 PAGEID 216–17 (39:25–40:2) (Lemons direct)).

three days per week toward "business development, sales and marketing as an independent[ ]" on Century Mechanical's behalf.  (Doc. 22 PAGEID 357–58 (180:7–181:7) (Wilmink direct); id. PAGEID 366 (189:15–22) (Wilmink direct)).

Wilmink "immediately" formed Defendant Mechanical Optimizers, LLC ("Mechanical Optimizers")—a consulting business that has ownership in two contracting companies—after his employment with Comfort Systems terminated.  (Doc. 22 PAGEID 366–67 (189:5–190:21) (Wilmink direct); id. PAGEID 403 (226:7–12) (Wilmink cross)).  Wilmink serves as President and Managing Partner.  (Id.).  Mechanical Optimizers is one of Comfort Systems' competitors.  (Id. PAGEID 275–76 (98:21–99:4) ("We're in the exact same industry and the same geographical market.") (Lemons redirect)).

**The Contracts Between the Parties.**  Comfort Systems and Wilmink entered into an Employment Agreement on May 4, 2017.  (Id. ¶ 14; Doc. 22 PAGEID 209 (32:7–18) (Lemons direct); "Vice President of Sales and Marketing Employment Agreement," JX 10 (Bates COM0022–29)).  "[M]any items" within the Employment Agreement were negotiated.  (Doc. 22 PAGEID 209–13 (32:22–36:11) (Lemons direct)).  The sections relevant to injunctive relief read:

> 4.  **Protection of Trade Secrets and Confidential Information.** The Employee acknowledges that in the course of performing services for the Company, including the time period during which he worked with the Company as a consultant, he has been and will be entrusted with, has had and will have access to, and/or has obtained and will obtain detailed and comprehensive knowledge of the Company's Trade Secrets and Confidential Information ("TSCI"). The Employee agrees the Company's TSCI is highly valuable and provides a competitive advantage to the Company and that, given the market in which the Company competes, confidentiality of its TSCI is necessary.

Accordingly, while performing services for the Company and thereafter, the Employee agrees:

a.     To retain the TSCI in absolute confidence, and

b.     Not to disclose and/or permit access to the TSCI, directly or indirectly, to or by any person, entity, or organization, and

c.     Not to use the TSCI for his own benefit and/or the benefit of any person, entity, or organization,

except as required in the normal course of providing services to the Company pursuant to this Agreement.

After the termination of this Agreement, the Employee agrees to return to the Company, its successors, or assigns all TSCI in tangible or digital form, all devices, computer disks or other electronic or magnetic storage media, records, data, proposals, lists, specifications, drawings, sketches, materials, equipment other documents, or property together with all copies (in whatever medium recorded). If applicable, the return of all Company property includes cooperating with the Company to insure the return or secure destruction of all electronically stored information ("ESI") related to the Company or which constitutes Company property or TSCI, including any such property or work product electronically stored on the Consultant's computers, other electronic devices, or electronic storage media, even though owned and operated by others, to which he has access. The Employee agrees not to modify or delete any such ESI without first notifying the Company's CEO and receiving prior written authorization to modify or delete such ESI. The Employee acknowledges that the Company takes reasonable steps to maintain the confidentiality and secrecy of its TSCI.

Trade Secrets and Confidential Information or TSCI means all confidential and/or proprietary information of the Company, including without limitation: information concerning former, current, or prospective customers, vendors and/or suppliers; (including without limitation, methods of operation, requirements, preferences, and/or history of dealings with the Company); costs, profit margins, and pricing; strategies and business plans; secret formulations, techniques, methods, processes, technical information, inventions (whether patented or unpatented); copyrights; trademarks; computer programs and codes and related documentation; processes, research and development, licenses, permits; methods of operation and providing service to customers, sales and financial

data; sales and marketing plans, methods, strategies, and activities; employee wages, salaries, and other forms of compensation, and trade secrets. The following will not constitute TSCI for purposes of this Agreement: (i) information which was known (as demonstrated by prior written record) to the Employee prior to disclosure to the Company, or is generally available to the public; or (ii) information which, hereafter, through no fault, act, or omission of the Employee, becomes generally available to the public; or (iii) information which corresponds in substance to that furnished to the Employee by any third party having a bona fide right to do so and not having any confidential obligation, direct or indirect, to the Company with respect to same; or (iv) information which corresponds to that furnished by the Company to any third party (other than such information provided to a customer about that customer's dealings with the Company) on a non-confidential basis.

5. **Non-Competition and Non-Solicitation of Company Customers or Employees.** While the Employee is performing services for the Company pursuant to this Agreement and for a period of 24 months thereafter, the Employee shall not, directly or indirectly, through any person or entity, for his benefit or the benefit of another entity or person other than the Company: a) induce, solicit, divert, take away, or accept business of the type or kind done by the Company as a part of its business from any Customer of the Company; and/or b) provide consulting services to a person, contractor, or entity that is in competition with the Company's business, as described below, within 100 straight-line miles of Hamilton County, Ohio, and/or c) induce, solicit, persuade, recruit, or encourage any employee of the Company to terminate his or her employment with the Company or be employed or accept employment or any other working relationship with any entity or person other than the Company.

"Customer" means each and every other entity or person that, at any time during the 56- month period prior to the cessation of the Employee's services pursuant to this Agreement, i) the Company, the Employee, and/or any employee or consultant of the Company sold or otherwise provided systems, project work, materials, goods, and/or services, ii) had been in contact with the Company, the Employee, and/or any employee or consultant of the Company for a business purpose, or iii) had been the subject of planning or consideration by the Company, the Employee, and/or any employee or consultant of the Company as a prospective customer

of the Company. Customer includes those related to the
Mechanical Optimizers sales and marketing strategy.

"Employee" means any person who is or was employed by the
Company, at any time during the 56-month period immediately to
the cessation of the Employee's services pursuant to this
Agreement.

The "Company's business" includes, but is not limited to, design-
build, installation, maintenance, service, repair and replacement of
industrial, institutional, and commercial HVAC, refrigeration, and
control systems for both for-profit and non-profit entities. Its
business includes preventive maintenance and full-coverage
maintenance agreements, emergency and proactive equipment and
systems replacement, and new installations.

The Employee may engage on behalf of the Company persons or
entities to perform sales and marketing services to it. He shall take
reasonable actions to assure that any such persons or entities
adhere to paragraphs 4 and 5 of this Agreement.

<u>If the Employee violates this paragraph, it is expressly agreed that,
in order for the Company to receive the full benefit of the
Employee's covenant, the 24-month limitation period will not expire
until 24 months following the date on which the Employee last
ceases to be in violation of this paragraph</u>.

(JX 10 (Bates COM0025–27) (emphasis added)).

Comfort Systems and Wilmink entered into a Separation Agreement on September

16, 2020.  (Doc. 1 ¶ 34; Doc. 22 PAGEID 219 (42:2–19) (Lemons direct); "Separation and

General Release Agreement," JX 12 (Bates COM0003–07)).  The sections relevant to

injunctive relief read:

. . . .

WHEREAS, Employee is subject to certain non-competition,
non-solicitation and other restrictive covenants pursuant to Employee's
May 1, 2017 Vice President of Sales and Marketing Employment
Agreement (the "Employment Agreement"); and

WHEREAS, the Company is terminating Employee's employment effective September 16, 2020;

. . . .

4.  *Acknowledgement of Restrictive Covenant Obligations.* Employee acknowledges, and agrees to comply with, the protection of Company trade secrets and confidential information under Section 4 of the Employment Agreement and the non-competition and non-solicitation obligations under Section 5 of the Employment Agreement ("Restrictive Covenant Obligations"), which remain in full force and effect in accordance with their terms except it is modified as follows:

> The first paragraph of Section 5 of the Employment Agreement is modified to read as follows:
>
> "While the Employee is performing services for the Company pursuant to this Agreement and for a period of 24 months thereafter, the Employee shall not, directly or indirectly, through any person or entity, for his benefit or the benefit of another entity or person other than the Company: a) induce, solicit, divert, take away, or accept business of the type or kind done by the Company as a part of its business from any Customer of the Company; and/or (b) induce, solicit, persuade, recruit, or encourage any employee of the Company to terminate his or her employment with the Company or be employed or accept employment or any other working relationship with any entity or person other than the Company."

(JX 12 (Bates COM0003, COM0004) (emphasis added)). This bargained-for modification of the first paragraph of Section 5 of the Employment Agreement allowed Wilmink, upon his resignation from Comfort Systems, to "provide consulting services to a person, contractor, or entity that is in competition with [Comfort Systems'] business[          ] within 100 straight-line miles of Hamilton County, Ohio[.]" (Doc. 22 PAGEID 220–22 (43:25–45:3) (Lemons direct)). But Wilmink remained obligated—for 24 months after his resignation—to not "induce, solicit, persuade, recruit, or encourage any employee of

[Comfort Systems] to terminate his or her employment with [Comfort Systems] or be employed or accept employment with any entity or person other than [Comfort Systems]." (Id. PAGEID 222 (45:4–9) (Lemons direct)).

Based on a September 16, 2020 separation date, Wilmink understood that his "restricted" period would run through September 15, 2022. (*See* id. PAGEID 291 (114:2–6) (Wilmink cross)).

**Wilmink Solicits Comfort Systems Employee Tyler Gastright during the Restricted Period.** Immediately following the acquisition, Comfort Systems paid Tom Lienhart, the former owner of Century Mechanical, to train Tyler Gastright who was hired (by Wilmink) as Vice President of Engineering and Sales. (Doc. 22 PAGEID 226–27 (49:8–50:19) (Lemons direct)). According to Lemons, "So we double-paid, had Tyler on the payroll, had the owner on the payroll to try to get as much of the proprietary confidential information, data, ideas that Tom had in his mind transferred as much into Tyler as possible so that he would basically become the successor of that part of the job responsibility that was needed for the company." (Id. PAGEID 227 (50:10–15) (Lemons direct)). Lemons considers Gastright to be a "valuable" employee of Comfort Systems. (Id. PAGEID 226 (49:14–16) (Lemons direct)).

Wilmink admits that he solicited Gastright to work for him at Mechanical Optimizers. (Doc. 22 PAGEID 286 (109: 5–8) ("I agree that I solicited – I gave Tyler an opportunity to come to work for me this fall [2022], that's correct.") (Wilmink cross)). On February 19, 2022, Wilmink texted Gastright and asked for his personal email address. (Id. PAGEID 286 (109:9–25) (Wilmink cross); JX 30 (Bates WIL_000175) ("Tyler, Hope all is going well do you have a personal email would like to send you some information.

9

Jeff")).  Gastright obliged.  Wilmink then texted, "Glad to here (sic) you are killing it I always knew you would.  We are doing extremely well too and I want you on my team as I always promised.  I will send you a email and let me know if you want to get together." (Doc. 22 PAGEID 287 (110:1–8) (Wilmink cross); JX 30 (Bates WIL_000175)).  Wilmink's email (also sent on February 19, 2022) begins, "I know you have a great job now at CSUSA but I am willing to make you a partner and my successor in our company.  I would like you to become Vice President of Mechanical Optimizers LLC & my right hand person starting this fall[.]"  (Doc. 22 PAGEID 287–88 (110:11–111:19) (Wilmink cross); JX 17 (Bates COM0035)).  Wilmink promised benefits specific to Gastright and attached a standard Mechanical Optimmizers "Employee Benefit Summary" and "Overview".  (JX 17 (Bates COM0035–50)).

Wilmink emailed Gastright a second time on February 21, 2022.  That email reads, "Again I promised you when I hired you that we would retire together and I keep my promises.  If being a partner & owner instead of working for someone is not something you want to do I totally understand."  (JX 18 (Bates COM0054)).  Wilmink sent another email on March 11, 2022.  It reads, "Did not hear back from you but I wanted to let you know the opportunity is available to you 10/1/22 if you are interested.  I could not do anything earlier than that because I solicited you and my agreement is up 9/15/22."  (Id. (Bates COM0053)).  Gastright sent a polite response on March 14, 2022, to the effect that "[t]hings are going really well right now" for him at Comfort Systems, but promising Wilmink to "make sure to let you know if I have any questions."  (Id. (Bates COM0052)). Wilmink's final email, sent on March 15, 2022 (at 9:18 AM), reads, "Thanks for getting

back with me and I guess my job is done if you are happy. I wish you nothing but continue (sic) success and I will always have a spot for you on my team!!" (Id. (Bates COM0051)).[5]

Wilmink explained that he offered Gastright a job "in the fall after my non-solicitation is over[,]" but (begrudgingly) agreed that, on the date of the offer—February 19, 2022—he was still in his "restricted" period. (Doc. 22 PAGEID 288–91 (111:24–114:10) (Wilmink cross)). Wilmink believed it was "okay" for him to solicit Gastright because he considered Gastright to be a "family friend[.]" (Id. PAGEID 291–92 (114:24–115:16) (Wilmink cross); id. PAGEID 371 (194:1–3) ("I mean, he went to grade school with my son at Blessed Sacrament, and I coached him in second and third grade basketball, so I would say [I've known Tyler and his family] for 30-plus years.") (Wilmink direct)).[6]

**Wilmink's Interaction with Other Comfort Systems Employees during the Restricted Period. Dave Deidesheimer** became a Comfort Systems employee when it acquired Century Mechanical in April 2017, serving as its Director of Construction Operations (Doc. 22 PAGEID 318 (141:3–22) (Deidesheimer direct)). His last day of employment was April 22, 2022, having provided a four-week notice of his intent to resign on March 21, 2022. (Id. PAGEID 319 (142:10–23) (Deidesheimer direct)). Deidesheimer made his decision to resign in November 2021, when "the task of the job and the stress

---

[5] Gastright testified that he did not "seriously consider" Wilmink's offer to join Mechanical Optimizers in October 2022. (Doc. 29-1 PAGEID 504 (32:3–10) ("Can you rephrase that? You said seriously. I mean, yeah, I didn't consider it, no.") (Gastright cross)). Gastright forwarded his "[e]ntire [email] conversation with Jeff" to Dan Lemons, at Lemons' request, on April 4, 2022. (JX 18 (Bates COM0035; Doc. 29-1 PAGEID 506–07 (34:18–35:9) (Gastright cross)).

[6] Wilmink has since agreed to never hire Gastright. (Id. PAGEID 373 (196:5–12) (Wilmink direct)).

in the job began to get to me.  So it was at that time I decided I probably wasn't going to be able to finish my career with Comfort Systems."  (Id. PAGEID 320 (143:3–6) (Deidesheimer direct)).  "A lot of it had to do with the age – I was going to turn 60 in April of 2022.  Given that, I thought I had to do something sooner than later.  If I waited too long, it would be harder to find a job elsewhere."  (Id. PAGEID 321 (144:7–17) (Deidesheimer direct)).  Having made the decision to resign and wanting to return to private industry, Deidesheimer called Wilmink in November 2021 to ask for a job.  (Id. PAGEID 321–22 (144:18–145:25) (Deidesheimer direct)).  Wilmink responded that "he would like to have me, but he had a no-solicitation clause until September of 2022.  I said, 'That's fine.  I can wait until then.'"  (Id. PAGEID 323 (146:1–7) (Deidesheimer direct)).

"Things [got] progressively worse[ ]" for Deidesheimer at Comfort Systems, however, with his department at increasing odds with Tyler Gastright's.  (Id. PAGEID 323 (146:8–25) (Deidesheimer direct)).  At his annual review, Deidesheimer told his supervisor, Brian Ballitch, that he "would probably be stepping down from [his] position within the next year or two."  (Id. PAGEID 324 (147:1–18) ("The original intention, obviously, was to try to stay with the company, but it didn't work out.") (Deidesheimer direct)).  Deidesheimer called Wilmink again (in February 2022) to say that he would be leaving Comfort Systems "sooner" than September and that he would be able to work for Wilmink sooner "if he could see fit to make it work."  (Id. PAGEID 324–25 (147:19–148:19) (Deidesheimer direct)).  Wilmink said he would try.  (Id. PAGEID 325 (148:20–23) (Deidesheimer direct)).

Wilmink initially provided Deidesheimer with an offer letter (as Director of Install Operations) dated March 7, 2022. (JX 5 (Bates WIL_000037)).  Deidesheimer's

anticipated start date was listed as Monday, October 3rd, 2022, which was "the end of Jeff's no solicitation."  (Doc. 22 PAGEID 328–29 (151:22–152:5) (Deidesheimer direct)).  On Friday, March 18, 2022, however, Deidesheimer confirmed in a text to Wilmink that he wanted to start work at Mechanical Optimizers on April 25, 2022.  (JX 2 (Bates WIL_000194–95)).

Deidesheimer gave notice of his resignation on Monday, March 21, 2022.  (*See* Doc. 22 PAGEID 326 (149:7–8) (Deidesheimer direct)).  In a meeting with Ballitch and Dan Lemons, Deidesheimer said that he "was seeking employment elsewhere[ ]" but did not mention Mechanical Optimizers.  (Id.  PAGEID 325–26 (148:24–149:24) (Deidesheimer direct)).  In a subsequent phone conversation (on March 27, 2022), Lemons told Deidesheimer that "even though I reached out or solicited Jeff, that somewhere along the lines Jeff would have had to have given me some sort of an offer letter, that that could be construed as solicitation from Jeff; and then if I was prepared for litigation, then he recommended I be prepared to submit e-mails, texts, phone conversations."  (Id. PAGEID 327 (150:3–22) (Deidesheimer direct)).[7]  Deidesheimer's last day of employment with Comfort Systems was Friday, April 22, 2022.  (See id. PAGEID 334 (157:6–11) (Deidesheimer cross)).

Deidesheimer was unemployed at the time he testified at the July 25 hearing.  (Id. PAGEID 317 (140:19–24) (Deidesheimer direct); id. PAGEID 334–35 (157:24–158:3) (Deidesheimer cross)).  He didn't start work at Mechanical Optimizers on April 25, 2022

---

[7] (*See also* Doc. 22 PAGEID 256–57 (79:2–80:17) ("Q. Okay. If that's what you said in your deposition, you agree that you told Dave it could get a little ugly, correct?  A. That's fine, yes.") (Lemons cross)).

because Wilmink knew he "would get sued if Dave came to work for [him]."  (Id. PAGEID 376–77 (199:12–200:8) (Wilmink direct)).

Wilmink sent **Jared Deich**[8] a text wishing him a "Merry Christmas" in December 2021, with the additional message "hopefully we can work together in 2022!"  (Doc. 22 PAGEID 294 (117:3–16) (Wilmink cross); JX 22 (Bates WIL_000185)).  Wilmink later asked Deich for his personal email address and, on February 14, 2022, sent him the same Mechanical Optimizers "Overview" that he sent to Gastright.  (Doc. 22 PAGEID 294–95 (117:17–118:6) (Wilmink cross); JX 23 (Bates WIL_000094)).  They had lunch together on March 9, 2022.  (JX 22 (Bates WIL_000189) ("You want to do Wednesday for lunch? Meet at office at 11:30 to get tour and then we can grab something near by.") (emphasis added)). Wilmink admitted to telling Deich (during lunch) that he would "love" to have him "join the team at some time."  (Doc. 22 PAGEID 295 (118:7–9) (Wilmink cross)).  On March 11, 2022, Wilmink forwarded to Deich an email from Brian Dunham, an attorney hired by Mechanical Optimizers, with the note, "Wanted to send the email from our attorney stating that we are free to hire CSUSA employees that solicit us which is what happen (sic) with you.  As we discussed we will cover any attorney fees required to resolve any issues that might come up."  (JX 24 (Bates WIL_000319–20)).  Then, on March 18, 2022, Wilmink emailed to Deich "a 1st draft of an offer letter for you to get started.  I also (sic) including our benefit information and cost.  As per our conversation it is my intention to have you run the Service Team and Dave [Deidesheimer] run Install." (JX 25 (Bates WIL_000098)).  Deich's start date was listed as "**TBD???**" in the offer letter.

---

[8] An organizational chart (dated 10/1/18) identifies Jared Deich as a Sales & Marketing Account Manager.  (JX 11 (Bates COM0060)).  Deich was later promoted to Service Operations manager.  (Doc. 22 PAGEID 282 (105:20–22) (Wilmink cross)).

(JX 25 (Bates WIL_000099)).  Wilmink intentionally did not put a date in Deich's offer letter because, at the time, he had no need for a Director of Service.  (Doc. 22 PAGEID 379 (202:18–25) (Wilmink direct)).  He also "didn't want to get sued."  (Id.).

Wilmink had lunch with **Tom Nieman**[9] on April 8, 2022.  (Id. PAGEID 380–82 (203:12–205:22) (Wilmink direct)).  Nieman made the initial contact (on March 16, 2022). (Id.; JX 20 (WIL_000204)).  He sent a "thank you" email to Wilmink after their lunch that said, "It was very encouraging talking with you and I would like to get together when it get's (sic) closer to your release date so we can firm things up and commit to a start date." (JX 21 (WIL_000156)).[10]  Wilmink admitted to telling Nieman (during lunch) that he would "love" to have any employee that once worked for him "back some day[.]"  (Doc. 22 PAGEID 293 (116:21–24) (Wilmink cross)).

Wilmink emailed a Mechanical Optimizers "Employee Benenfit Summary" and "Overview" to **Greg Robinson** (on February 19, 2022), with Robinson reaching out first to Wilmink.  (JX 26 (Bates WIL_000157) JX 35 (Bates WIL_000180–81); Doc. 22 PAGEID 296–98 (119:12–121:12) (Wilmink cross); id. PAGEID 382–84 (205:23–207:22) (Wilmink direct)).  Wilmink's email began, "Great talking to you a couple of weeks ago and hope we can find away (sic) to work together again!  I would like you to become Director of Service Operations for our company . . . ."  (JX 26 (Bates WIL_000157)).  Robinson last texted with Wilmink on March 9, 2022.  (JX 35 (Bates WIL_000181–84)).  Wilmink had lunch with **Dan Martin** on March 14, 2022, with Martin—like Robinson—reaching out first

---

[9] An organizational chart (dated 10/1/18) identifies Tom Nieman as Retrofit Operations manager. (JX 11 (Bates COM0060)).

[10] Wilmink did not respond to this email and did not make an offer of employment to Nieman. (Doc. 22 PAGEID 382 (205:7–22) (Wilmink direct)).

to Wilmink. (JX 34 (Bates WIL_000203); Doc. 22 PAGEID 385–86 (208:10–209:14) (Wilmink direct)). Martin followed up with an email on March 29, 2022, inquiring if he would be "a good fit for the team[.]" (JX 16 (Bates WIL_000141–42; Doc. 22 PAGEID 386–87 (209:21–210:6) (Wilmink direct)). Wilmink wrote back on April 11, 2022:

> I am concerned about making any offer to you until my non-solicitation is complete as you can probably understand.
>
> As we discussed I would love to have you join our team but I understand if you have a (sic) offer to move on now.
>
> I just can't be distracted with anything CSUSA might throw at me especially since Dave decided to leave and they will probably blame me even thought (sic) he is not working for us.
>
> Hopefully you understand and lets get back together at the end of summer.

(JX 16 (Bates WIL_000141)). This message is at odds with Wilmink's testimony that he was "just being nice" to Martin, because with only four service technicians, Mechanical Optimizers did not need a technical service adviser. (*See* Doc. 22 PAGEID 312–14 (135:8–137:15) (Wilmink cross); id. PAGEID 386 (209:15–20) (Wilmink direct)).

**Causes of Action Alleged in the Verified Complaint.** Comfort Systems brings five claims for relief: (1) breach of contract (the May 4, 2017 Employment Agreement) against Wilmink; (2) breach of contract (the September 16, 2020 Separation Agreement) against Wilmink; (3) tortious interference with contracts against Mechanical Optimizers; (4) misappropriation of trade secrets (pursuant to 18 U.S.C. § 1836 and the Ohio Uniform Trade Secrets Act) against Wilmink and Mechanical Optimizers; and (5) conspiracy against Wilmink and Mechanical Optimizers. (Doc. 1 (¶¶ 46–86)).

## II.    LAW & ANALYSIS

**Standard.**  Pursuant to Fed. R. Civ. P. 65, a party may seek injunctive relief when it believes that it will suffer immediate and irreparable injury, loss, or damage.  "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries [its] burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citations omitted).  In considering whether to grant a preliminary injunction, the court balances four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.  *Wilson v. Williams*, 961 F.3d 829, 836 (6th Cir. 2020). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Id.* (quoting *Overstreet*).  "Although no one factor is controlling, <u>a finding that there is simply no likelihood of success on the merits is usually fatal</u>." *Concentrix CVG Customer Mgmt, Grp. Inc. v. Daoust*, No. 1:21-cv-131, 2021 WL 1734284, at \*8 (S.D. Ohio May 3, 2021) (quoting *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)) (emphasis added).

### A.  Likelihood of Success on the Merits

### 1.  Breach of Contract Claims Against Wilmink

In Ohio,[11] "[t]o establish a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the

---

[11] Section 7 of the May 4, 2017 Employment Agreement provides that the Agreement shall be "governed by the laws of the State of Ohio[.]"  (JX 10 (Bates COM0027)).

defendant, and (4) damages or loss resulting from the breach." *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (citing *Claris, Ltd. v. Hotel Dev. Servs.*, LLC, 104 N.E.3d 1076, ¶ 28 (Ohio Ct. App. 2018)).

### a. Trade Secrets and Confidential Information ("TSCI")

Wilmink agreed, "while performing services for [Comfort Systems] and thereafter," to not use its TSCI for "his own benefit and/or the benefit of any person, entity, or organization[.]" In its Verified Complaint, Comfort Systems alleges that Wilmink is in breach of the September 16, 2020 Separation Agreement because he is using its "confidential and proprietary information for his benefit and the benefit of . . . Mechanical Optimizers." (Doc. 1 ¶ 61). Specifically, Wilmink has "accessed, used, and/or disclosed" its "confidential, proprietary, and trade secret information (including but not limited to Comfort[ Systems'] forms, strategies, and processes, and information related to [its] employees) to essentially recreate [its] business with the 'same focus'[.]" (Id.).

Little to no evidence of any, much less ongoing, breach was introduced at the July 25 hearing. Notably, Dan Lemons testified that he was not aware of any paper or electronic documents or property that Wilmink took with him when he resigned.[12] (Doc. 22 PAGEID 259–60 (82:25–83:17) (Lemons cross)). And Lemons confirmed that "Jeff returned everything that he was required to return when he resigned from Comfort [Systems] in September of 2020[.]" (Id. PAGEID 260 (83:18–21) (Lemons cross)). Lemons further testified that he knew of no access, use, or disclosure of trade secrets by Wilmink since he left Comfort Systems' employ in September 2020. (Id. PAGEID 268

---

[12] Lemons seemed to presume, but could not confirm, that Wilmink took with him JX 11, organizational chart (dated 10/1/18). (Doc. 22 PAGEID 260 (83:6–7) ("Q. Do you have any idea where that org chart came from?" A. I do not.") (Lemons cross)).

(91:13–22) (Lemons cross)).

In its post-hearing brief, Comfort Systems maintains that Wilmink used its "confidential and proprietary information" to induce its "most valuable employees" to leave its employ and "come work for him at Mechanical." (Doc. 26 PAGEID 445). This argument tracks Lemons' testimony that Comfort Systems does not share with its competitors who its "star performers" are or what it pays them. (*See* Doc. 22 PAGEID 192–93 (15:24–16:24) (Lemons direct); id. PAGEID 195–96 (18:21–19:11) (Lemons direct)). This testimony, however, was not further developed.

The Court concludes that Comfort Systems, at this juncture, has failed to show any, much less a strong, likelihood of success on this breach of contract claim. This finding is "fatal" to any further consideration of this claim vis-à-vis preliminary injunctive relief. *See Concentrix CVG*, 2021 WL 1734284, at *8 (quoting *Gonzales*, 225 F.3d at 625).

### b.  Non-Solicitation of Employees

Wilmink agreed, for 24 months after he resigned, to not "solicit" Comfort Systems employees to come work for him. And he agreed to not "induce" or "persuade" or "recruit" or "encourage" them. Comfort Systems adduced sufficient evidence at the July 25 hearing that Wilmink, at a minimum, did at least three of these things in violation of both the Employment Agreement and the Separation Agreement.

Wilmink admitted to soliciting Tyler Gastright. This breach is not excused by the fact that he considered Gastright a family friend[13] or that he communicated with Gastright

---

[13] (Doc. 22 PAGEID 395 (218:21–25) ("Q. My question was a little bit different. Where in paragraph 5 of your Employment Agreement does it say that there is an exception to the non-solicitation restriction where the Comfort employee is a family friend?  A. It does not say that.") (Wilmink cross)).

for less than a month[14] or that Gastright declined his offer[15].  Nor is it excused by Wilmink's end-run maneuver to set a start date outside the restricted period.  In addition, Comfort Systems introduced sufficient evidence that Wilmink both "recruited" and "encouraged" Dave Deidesheimer by virtue of sending him an offer letter during the restricted period and later promising to try to move up his start date to within the restricted period.  Comfort Systems likewise introduced sufficient evidence that Wilmink "recruited" Jared Deich by virtue of sending him a draft offer letter during the restricted period and promising to cover his attorney's fees if Comfort Systems sued.

Wilmink defends by pointing out that the non-solicitation covenant in his Employment Agreement does not prohibit him from either "communicating" or "hiring" Comfort Systems employees.  (Doc. 27 PAGEID 456).  But these distinctions aren't in play.  Nor does it matter that Comfort Systems "has not lost a single employee to Mechanical Optimizers[.]"  (Doc. 22 PAGEID 272 (95:23–25) (Lemons cross); *see* Doc. 27 PAGEID 462).  "No harm, no foul" is not a proper tenet of contract law.

The Court concludes that Comfort Systems has shown a strong likelihood of success on this breach of contract claim.  This factor weighs in favor of Comfort Systems.

## 2. Misappropriation of Trade Secrets Claim Against Wilmink and Mechanical Optimizers

To succeed on its trade secrets claim, Comfort Systems must show: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret.  *CNG Fin. Corp. v. Brichler*,

---

[14] (*See* Doc. 27 PAGEID 463 n.9).

[15] (*See* Doc. 27 PAGEID 461–62).

No. 1:21-cv-460, 2021 WL 4189577, at *11 (S.D. Ohio Sept. 14, 2021) (citing *MEMC Elec.*

*Materials, Inc. v. Balakrishnan*, No. 2:12-cv-344, 2012 WL 3962905, at *6 (S.D. Ohio

Sept. 11, 2012) (citing *Heartland v. Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*,

258 F. App'x 860, 861 (6th Cir. 2008))).  Ohio law defines a "trade secret" as:

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1331.61(D).

As mentioned in connection with Comfort Systems' TSCI breach of contract claim,

Dan Lemons unequivocally testified that he knew of <u>no</u> unauthorized use of a Comfort

Systems trade secret by Jeff Wilmink:

> Q. You do not know of any alleged trade secrets that Jeff has used since he left in September of 2020, correct?
>
> A. Correct.
>
> Q. And you do not know of any alleged trade secrets that Jeff has disclosed since his resignation in September of 2020, correct?
>
> A. Correct.
>
> Q. You don't know of any trade secret information that Jeff even has access to, right?
>
> A. Correct.

Q. And, in fact, Mr. Lemons, you have not testified today about a single document that Comfort claims contains trade secret information, correct?

A. Correct.

(Doc. 22 PAGEID 268–69 (91:13–92:1) (Lemons cross)).  This testimony precludes a finding that Comfort Systems, at this juncture, has shown a strong likelihood of success on its misappropriation of trade secrets claim.  And this finding is "fatal" to any further consideration of this claim vis-à-vis preliminary injunctive relief.  *See Concentrix CVG*, 2021 WL 1734284, at *8 (quoting *Gonzales*, 225 F.3d at 625).

## B. Irreparable Harm

Irreparable harm exists when there is a substantial threat of material harm that cannot be adequately compensated through monetary damages. *See Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1007 (S.D. Ohio 2008) (citing *FOP v. City of Cleveland*, 141 Ohio App. 3d 63, 81, 749 N.E.2d 840, 853 (2001)).

Dan Lemons testified that "it's always difficult to recruit talent and find people to add to your team and grow and recruit at all levels of technicians, to managers, to general managers."  (Doc. 22 PAGEID 196 (19:7–9) (Lemons direct)).  Comfort Systems uses salary and incentives to retain employees—especially "star performers"—and further trains or transitions those who "don't perform quite as well[.]"  (Id. PAGEID 193 (16:7–19) (Lemons direct)).  Wilmink's actions have been a "big distraction" all around.  (Id. PAGEID 234 (57:11–16) (Lemons direct)).  Comfort Systems has been forced to "manage" the concerns of its employees, along with its own that valued employees might jump ship to work for Mechanical Optimizers.

The Court agrees that the real harm done to Comfort Systems thus far—and until

this matter is finally resolved—is not financial and, therefore, suitably addressed by a preliminary injunction. This factor weighs in favor of Comfort Systems.

### C. Harm to Others

"The irreparable injury [the plaintiff] will suffer if [its] motion for injunctive relief is denied must be balanced against any harm which will be suffered by [others] as a result of the granting of injunctive relief." *Concentrix CVG*, 2021 WL 1734284, at *16 (quoting *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982)). In this regard, Wilmink contrasts its bona fides (small, private company with $3.8 million in revenue in 2021, $5 million projected in 2022) with behemoth Comfort Systems (publicly traded national company with over $3 billion in annual revenue). (Doc. 27 PAGEID 467). But an injunction does not undercut Mechanical Optimizers' right to compete against Comfort Systems or hire individuals "who reach out" for a job. (*See id.*). It simply enforces the bargain to which Wilmink—having the benefit of counsel—agreed. Comfort Systems and Mechanical Optimizers aren't the only two industry players in the industry in this "space"[16] and Wilmink has no "hands off" restriction as to current employees of other competitors.

This factor weighs in favor of Comfort Systems.

### D. Public Interest

"The Court believes that the public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts." *Nat'l Interstate Ins. Co. v. Perro*, 934 F. Supp. 883, 891 (N.D. Ohio 1996); *see ALTA Analytics, Inc. v. Muuss*, 75 F. Supp. 2d 773, 786 (S.D. Ohio 1999) (quoting *Perro*). This factor, too, then, would weigh in favor

---

[16] (*See* Doc. 22 PAGEID 189–90 (12:17–13:23) (Lemons direct)).

of Comfort Systems.

The Court is not persuaded by Defendants' arguments that the "tolling" provision found within the "non-solicitation" covenant is unlawful.  (*See* Doc. 27 PAGEID 463–65). Comfort Systems is entitled to the full benefit of its bargain given the facts of this case. Wilmink did not "resist" signing an Employment Agreement in 2017.  (Doc. 22 PAGEID 202–03 (25:13–26:7) ("We actually used the Employment Agreement that he had in place with Century, and we worked off of that agreement and changed a little bit of language to make it with Comfort Systems, obviously.  And then Jeff sent me a long list of items that he wanted to negotiate with his Employment Agreement, and then we worked through those items.") (emphasis added) (Lemons direct)).  Dan Lemons testified that the 24-month restriction "is what [Wilmink] had in place already with Century Mechanical, so we didn't try to negotiate for more.  We accepted the 24 month that was already in place in his – in that prior agreement."  (Id. PAGEID 217 (40:10–13) (Lemons direct)).  Wilmink does not claim that he asked to negotiate for "less" in 2017, or when the parties modified Section 5 of the Employment Agreement in 2019.  (JX 13 (Bates COM0016) ("I think this is very fair I only had 2 request [Consulting and Non-Disparagement] if possible[.]")).

### III.     CONCLUSION

For the foregoing reasons, Comfort Systems' Motion for Preliminary Injunction (Doc. 2) will be **GRANTED in part.**  Pursuant to Fed. R. Civ. P. 65—and in accord with the May 4, 2017 Employment Agreement (§ 5) and the September 16, 2020 Separation Agreement (§ 4) between the parties—Defendant Jeffrey K. Wilmink is **PRELIMINARILY ENJOINED** from inducing, soliciting, persuading, recruiting, or encouraging any employee of Plaintiff Comfort Systems USA (Ohio), Inc. to terminate his or her employment with Comfort Systems or be employed or accept employment or any other working relationship with any entity or person other than Comfort Systems **through March 14, 2024** (which is 24 months from March 15, 2022)[17].  The remainder of Comfort Systems' Motion for Preliminary Injunction is **otherwise DENIED**.

The bond requirement set forth in Fed. R. Civ. P. 65(c) is **WAIVED**.  *See Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) ("While we recognize that the language of Rule 65(c)[18] appears to be mandatory, and that many circuits have so interpreted it, the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security.") (citations omitted).

By virtue of the passage of time, Comfort Systems' Motion for Temporary Restraining Order (Doc. 2) is **DENIED as moot**.

---

[17] Wilmink's final email to Tyler Gastright—in which he states "I will always have a spot for you on my team!!—was sent on March 15, 2022.  (*See* JX18 (Bates COM0051)).

[18] "The court may issue a preliminary injunction . . . **only if** the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined . . . ."  Fed. R. Civ. P. 65(c) (emphasis added).

Comfort Systems' Motion for Permanent Injunction (Doc. 2) is **DENIED**, on procedural grounds, **as premature**.  *Giroux v. LaRose*, No. 1:22-cv-309, 2022 WL 2128017, at *7 (S.D. Ohio June 14, 2022) (citing *Hogan v. Cleveland Ave Rest., Inc.*, No. 2:15-cv-2883, 2021 WL 963746, at *1 (S.D. Ohio Mar. 15, 2015) ("Issuance of a permanent injunction is not proper until some final entry in this matter.  Here, the merits of the case have not yet been adjudicated, and thus Plaintiffs cannot show 'actual success on the merits' as required [by the Supreme Court] to obtain a permanent injunction.")).

**IT IS SO ORDERED.**

*/s/ Michael R. Barrett*
JUDGE MICHAEL R. BARRETT
